UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD ANTHONY PETERSON,<br><br>Petitioner,<br><br>v.<br><br>JOE LIZARRAGA, Warden of MCSP,<br><br>Respondent. | No. 1:17-cv-01537-LJO-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION THAT THE COURT DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**FINDINGS AND RECOMMENDATION THAT THE COURT DISMISS THE MOTION FOR SUMMARY JUDGMENT AS MOOT**<br><br>**(Docs. 14, 77)** |

Petitioner, Richard Anthony Peterson, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner presents three grounds for habeas relief: (1) prosecutorial misconduct; (2) violation of his Due Process Rights based on the trial court's refusal to grant him a continuance; and (3) ineffective assistance of counsel.[1]  The Court referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302

---

[1] On December 20, 2017, Petitioner filed an "Addendum to Habeas Corpus," in which he asserts two additional grounds for habeas relief: (1) factual innocence, and (2) the prosecutor denied him "access to the courts" beginning in November 2016.  In his traverse, Petitioner withdrew both claims, (Doc. 42 at 1); consequently, the Court will not address them.

1

and 304.  Having reviewed the record and applicable law, the undersigned recommends that the Court deny habeas relief.

Additionally, before the Court is Petitioner's motion for summary judgment, (Doc. 77), which the Court recommends dismissing as moot.

## I.    <u>Procedural and Factual Background[2]</u>

Petitioner, his wife, four minor children, and mother in law lived in a mobile home at a mobile home park in Inyokern, California.  The home was a rectangular, double-wide, 1971-era mobile home with metal sides and a flat metal roof.  A shed-type enclosure was attached to the rear and used for storage.

At 10:00 a.m. on September 17, 2009, a Kern County Deputy Sheriff responded to Petitioner's home and took a report from him.  Petitioner stated he had received an anonymous and threatening telephone call in the middle of the night.  Petitioner reported he also woke in the middle of that same night because he heard a sound that resembled an electric pencil sharpener.  Despite looking around outside, Petitioner did not see anything.  However, in the morning, Petitioner found three holes drilled in the eave above his front door.  The deputy saw the holes and noticed fresh sawdust and wood debris below them, and took a photograph of the eave.  Petitioner was concerned, and believed the same person who called him drilled the holes.

At 1:00 a.m. on September 29, 2009, the Kern County Fire Department responded to a fire at Petitioner's home.  When Captain Richard Reeder ("Reeder") arrived with his unit, Petitioner was standing outside, spraying water on the north side of the roof with a garden hose.  Reeder thought this behavior was odd because there was no fire coming out of the roof.

---

[2] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Peterson* (Cal. Ct. App. Dec. 14, 2015) (No. F068493), is presumed to be correct.  28 U.S.C. § 2254(e)(1).

Smoke was emerging from under the eaves, between the doors, and from different cracks in the home. The smoke was relatively strong, greyish-white and turning black, which meant the fire was starting to build. Although no flames were visible, there was a steady stream of smoke coming out of the home.

Reeder quickly walked around the structure to survey the situation, and believed the fire started in the rear kitchen. He decided to enter the home through the door on the west side, but it was locked. Reeder yelled to Petitioner, asking for the key, but Petitioner was still hosing down the roof and did not move. Petitioner told his wife to open the door. Petitioner's wife produced a full ring of keys, but could not find the right key to open the door.

Reeder ordered a firefighter to break down the door, which he did using a sledgehammer. The firefighters entered the living room within three or four minutes after arriving at the scene. There were no flames, but there was heavy black smoke waist high and Reeder could not see anything. Reeder fell three or four times over several obstacles in the family room, including furniture, tables, and boxes.

Using his water hose to work his way to the back of the structure, Reeder found heavy fire and extensive heat in the kitchen. The upper kitchen cabinets, ceiling, and attic space were on fire. The fire was hot and growing. Reeder sprayed the kitchen ceiling with his water hose and "knocked down" the intensity of the fire in five or six minutes. Residual flames remained in the structure, and it took 40 minutes to completely extinguish the blaze.

Firefighter Matthew Dominguez ("Dominguez"), wearing full gear, used a pike pole to pull down the ceiling to suppress the fire and noticed water come down from the ceiling. After approximately 20 minutes, he used a chainsaw to remove the hallway ceiling where the fire was located to ensure the fire was extinguished in the void space between the ceiling and the roof. As Dominguez cut the ceiling, a half-gallon or more of a clear fluid poured on top of him from the

ceiling. Dominguez left the home to change his oxygen tank. As he was changing the tanks outside, he smelled the odor of gasoline coming from his gear. Dominguez had been wearing a Nomex fire-resistant protective hood when the liquid fell on him, and gave the hood to Chief Shawn Whittington as part of the arson investigation.

After the fire was extinguished, Reeder and Petitioner walked through the home. Reeder smelled a flammable liquid that he thought was similar to paint thinner or some other mineral spirit.[3] The smell was in the kitchen, the bathroom hallway, and by the front door, and was stronger inside the house than outside. Reeder knew that paint thinner and mineral spirits were ignitable liquids that could be used as fire accelerants.

As they walked around the structure, Petitioner directed Reeder to look at three holes above the front door on the north side of the house. Earlier, Reeder had seen fire and flames in the area of those holes, and Petitioner had been spraying water on the roof in the same area.

Fire Captain Luis Monterroso ("Monterroso"), who also responded to the scene, determined the blaze was a ceiling fire with quite a bit of smoke damage. Petitioner's structure had a small attic void space between the interior ceiling and the roof, which contained noncombustible insulation. The void space was not designed for storage.

Reeder advised Monterroso of the holes above the north door. The holes penetrated into the void area between the ceiling and roof. In the area where the holes were drilled, Monterroso smelled flammable liquids, such as mineral spirits, a solvent, or paint thinner.

Monterroso found two 1-gallon plastic bottles on the hallway floor by the bathroom. He smelled the same odor of a solvent-type, mineral spirits liquid in the bottles. Monterroso only smelled flammable liquid by the front door holes and the area where the plastic bottles were found.

---

[3] Mineral spirits are petroleum-based liquids that are flammable or ignitable and include paint thinner and pure toluene.

4

The bottles were found in the hallway approximately one hour after the firefighters arrived at the house.

Reeder believed Petitioner was acting oddly when compared with other people in similar house fire situations. For example, when the fire crews arrived, Petitioner was spraying water on the roof, but there were no flames coming from the roof. Petitioner was not excited, he did not show any emotion, and he did not approach the firefighters when they arrived. Petitioner stayed at his location as he sprayed water on the roof and did not tell the firefighters anything about the structure or interior. The firefighters had to approach Petitioner for information. Reeder also noticed Petitioner's family was standing next to a large amount of clothing and luggage, which did not appear to have been gathered in haste. In the house, there were computers and game consoles in the family and dining rooms, which had been covered by blankets.

Reeder decided to call an arson investigator, because he believed the fire was suspicious in origin. Petitioner told Reeder that he was the victim of a "hate crime" and said, "that people hated him and they . . . set the fire on the house."

At 5:30 a.m., Battalion Chief Shawn Whittington ("Whittington") of the fire department's investigative unit arrived at the home. Reeder advised Whittington about the three holes drilled in the eave above the north door. Whittington found the holes had been drilled from the outside and noticed light charring and smoke damage around the holes. There was also charring in the doorway's interior, which had come down from the ceiling.

Whittington walked through the interior with Petitioner, but did not smell any ignitable liquids, mineral spirits, or gasoline on Petitioner. Whittington did, however, detect a "heavy" odor of ignitable liquid, similar to mineral spirits as he walked through the home. "It was a significantly overpowering smell of ignitable liquid . . . that I likened to that of mineral spirits. It was a very overpowering . . . so much overpowering, it was difficult to locate the source."

Whittington found the bulk of the damage to the structure was caused by the fire suppression efforts, which included removing the ceiling to look for the source of the fire. "The actual fire itself and the charring . . . was in a relatively small area."

Whittington used a combustible gas indicator (also known as the "sniffer") to find the source of the smell. Amid the ceiling debris and insulation on the floor, he saw the two plastic bottles in the hallway. The bottles were partially melted and a vent hole had opened in each one. He believed the bottles fell from the ceiling void while the firefighters were trying to extinguish the flames. The bottles were empty, but the interiors appeared to be wet, as if they had contained fluid. There were partial labels on the bottles that indicated they were "paint cleanup." The bottles were inside a plastic shopping bag that smelled like mineral spirits.

After taking photographs of the bottles, Whittington turned them over and found slash marks on the bottom that were "pretty consistent with the chain saw blade" cutting them open. Whittington believed the firefighter's chainsaw cut open the bottoms of the bottles and emptied the contents while he was trying to open the ceiling.

Whittington examined the ceiling and the void space above where the bottles were found. There was smoke damage in the void space between the ceiling and the roof. The bottles were found approximately 20 to 25 feet from the holes above the front door. There were some vents in the roof, but nothing that was "big enough to place those plastic containers into that void" from the outside. Nor could someone place the bottles into the void by raising the roof or any place outside the mobile home.

Based on the burn damage to the bottles, Whittington concluded they had contained ignitable liquids. Whittington ruled out potential accidental causes of the fire, and opined it was the result of arson. Whittington testified the point of origin for the fire was within three feet of the

area above the front door, where the three holes were drilled.

Specifically, Whittington testified:

Upon viewing evidence that I discovered . . ., you had an area of origin over the front door with a relatively, by all standards, low-intensity fire at that point. 25 feet away, you had plastic containers containing ignitable liquid in a plastic container that's easily failed. So you had the ability for that fire to grow at a pretty controlled rate. But once it hit those containers, then it would grow at quite a big significantly faster rate, and it . . . would enable the fire to burn at a faster rate and spread a little faster and burn the structure.

Whittington further testified he believed the bottles were at least half full when the fire began.

As of December 18, 2008, approximately nine months before the fire, Petitioner had an insurance policy insuring the home which covered $270,000 for the structure; $140,265 for personal property; $54,000 for living expenses; $28,053 for adjacent structures; and $500,000 for liability coverage for bodily injury with Foremost Insurance. The policy had an "intentional act" exclusion that excluded claims if the homeowner set fire to his or her own property.

After the fire, Petitioner submitted a claim on the policy. Mary McDonald ("McDonald") a branch claim supervisor recommended denying his claim based on the arson investigation and the amount of the policy. However, the insurance home officer overruled her recommendation and advised her to pay the claim. Petitioner was paid a total of $154,264.74 on the claim, which included structural damage, personal property loss, and living expenses. Petitioner received a payment on September 30, 2009, approximately 12 days after the fire.

On November 2, 2012, Petitioner's first trial began with motions in limine. On November 13, 2012, the presentation of evidence to the jury began. At the trial, the prosecutor introduced exhibit No. 21, a three-page certified grant deed for a residential property in Palmdale, California. Petitioner and his family moved to the property after the fire and started receiving insurance payments at the residence on December 23, 2009.

7

As the trial progressed, Petitioner's counsel became ill and the trial was continued for several days. On November 26, 2012, the trial court declared a mistrial because of defense counsel's illness and unavailability.

On October 8, 2013, Petitioner's second jury trial began with motions in limine. The presentation of evidence to the jury began on October 11, 2013.

At the second trial, the prosecutor introduced exhibit No. 41, a five-page certified copy of a grant deed in the names of Petitioner and his wife as joint tenants, for a residential property in Palmdale, California, dated October 23, 2009.[4] At this first trial, this exhibit was marked exhibit No. 21 and consisted of three, rather than five-pages.

A forensic examination was conducted on a computer found inside Petitioner's residence at the time of the fire. At trial the prosecutor's expert testified that at some point between August 31 and September 7, 2009, someone used the computer to visit the website www.foremost.com/news/2009/arson-school.htm (the "arson school website"). The website showed pictures of recreational vehicles and cars that were on fire. The text of the website stated: "One key observation was how difficult it was to start a fire in an automobile or recreational vehicle without ventilation." It also stated, "Newer models are so airtight, a fire will typically burn through its fuel and just self-extinguish," and "However, when a fire was started with an accelerant fueled by oxygen, it took less than eight minutes to start collapsing a" recreational vehicle.

The defense computer expert examined Petitioner's computer and discovered the search Petitioner had used which led him to the arson school website. On September 3, 2009, someone searched for "Foremost Insurance problems," which led to a hyperlink to "arson school." The

---

[4] Petitioner disputes the date of the deed, which will be analyzed fully, *infra*. The Court notes October 23, 2009, is the date the Court of Appeal provided in its factual background.

expert testified that the person did not directly search for "arson" or "arson school."

William Wilson ("Wilson") lived in the same mobile home park, knew Petitioner, and was involved in a romantic relationship with Petitioner's mother-in-law. Wilson testified for the defense, stating that in August 2009, he received a letter from his insurance broker about his insurance policy with Foremost Insurance, which advised him to change his policy to another company. While researching the insurance company on the internet, Wilson read that there were disputes with the company about paying claims. Wilson knew Petitioner's home policy was also with Foremost Insurance, and told Petitioner about the matter in September 2009.

The prosecutor also had two experts testify regarding laboratory tests conducted on evidence from the fire: five samples of ceiling material from the area where the holes were drilled above the north door; the two empty one-gallon plastic containers found in the hallway; and the firefighter's Nomex hood. The tests were conducted in November 2009, and paid for by the insurance company.

The tests showed "very high levels" of volatile components in the samples, which the experts explained meant that high levels of ignitable liquid vapors were present. The experts smelled some sort of solvent on the Nomex hood during the tests, and results showed a trace amount of ignitable liquid vapor.

Gas chromatograph and mass spectrometer tests were positive for gasoline on all the items. The experts testified that gasoline is an ignitable liquid that can be used as an accelerant. Some pieces of the front porch ceiling had higher levels of toluene than expected for gasoline, indicating the presence of another ignitable liquid. These results could have also come from the decomposition of the material during the fire, which would have burned off toluene.

The experts could not exclude the presence of mineral spirits from the items, because gasoline and mineral spirits "share a lot of the similar components."

9

A defense expert testified about the laboratory tests conducted by the prosecution. The items from the fire were tested by two different laboratories and the defense expert stated the results from the laboratories were "not even close to being identical" to each other. One laboratory found gasoline, while the other laboratory found mineral spirits on the materials. One laboratory also found a significantly higher amount of toluene in the samples; whereas the other laboratory found a "very miniscule, very, very low level" of toluene.

The defense expert conceded gasoline was present in all the samples and stated he could not exclude gasoline or mineral spirits with any certainty because they are very similar. "[Y]ou cannot decide either way if it is mineral spirits or gasoline. . . . It could have been either."

Two of Petitioner's children, aged 10 and 14 years old, testified at trial. They stated that on the night of the fire, they were asleep when they heard their father yell that there was a fire, and he made them run out of the house. The children stated they did not know how the blankets were placed on top of their computers during the fire.

Petitioner's mother-in-law, Mary Fernando ("Fernando"), testified that she was asleep when she heard Petitioner yell that there was a fire. Two months before the fire, Fernando had packed two large suitcases in preparation for an upcoming trip to Sri Lanka, where she and her daughter, Petitioner's wife, were from. When Petitioner yelled about the fire, she dragged those suitcases out the back door as she left the house. Fernando and Petitioner's wife also grabbed laundry from the back room on their way out.

Fernando stated that approximately six to eight months before the fire, when Petitioner was not home, an unknown man came to the door looking for Petitioner. The man acted "rowdy" and Fernando was scared. When told Petitioner was not at home, the man stated that he would be back.

The president of the homeowner's association in the mobile home park, Ronald Peterson ("Ronald"),[5] testified that he had multiple conflicts regarding the homeowner's association and the board with Petitioner. Petitioner had tried and failed to join the board, and often argued about the board's decisions. Ronald stated that shortly before the fire, he was part of a decision by the board of the homeowner's association to file a nonjudicial foreclosure lien against another property that Petitioner owned in the mobile home park.

Petitioner testified in his own defense at trial. He stated that five years before the fire, he bought bottles of "paint cleanup" for a renovation project. Petitioner, his wife, and a friend worked on the projects. The paint cleanup material was used to clean paintbrushes and stains on doorknobs. After the projects were finished, Petitioner's friend put the bottles of "paint cleanup" away, and Petitioner did not know what happened to them or that they had been placed in the attic.

Petitioner testified he had an adversarial relationship and "run ins" with the homeowner's association president, Ronald, and the board. Petitioner ran against Ronald's brother for a seat on the homeowner's association board and believed the members of the board had stolen money. Petitioner testified that in 2006, while working on a nearby property, Ronald drove by and said, "I can't wait to get a son of a bitch like you out of the park." In 2009, Ronald drove by Petitioner's house, honked the horn, and made an obscene gesture while Petitioner's family was present.

Petitioner received multiple complaints and inquiries from regulatory agencies about the condition of his property, which were initiated by the board, but he resolved all complaints.

Before the fire, after being advised about problems with Foremost Insurance, Petitioner used his computer to investigate the company and found a site about how the insurance company "fights fraud." Petitioner clicked on the site and reached something called "arson school," which

---

[5] Ronald Peterson is not related to Petitioner and will be referred to by his first name to avoid any confusion.

he did not look at.

Petitioner testified he had received several threats before the fire. This included a threat from a man who stopped by his house when Petitioner was not home. The man punched the side of the house, which created an indentation on the wall between the light and the doorbell. Additionally, on the night of September 16, 2009, Petitioner testified he received a threatening telephone call, but Petitioner did not describe he caller's voice or what the caller said. That same evening, he heard a sound like someone using an electric pencil sharpener. The noise started and stopped multiple times. Petitioner thought it was his children, so he yelled, "Go to bed," or "Go to sleep," and the noise stopped. When he realized the lights were out and the children were asleep, he opened the front door and look outside, but did not see anything.

On September 17, 2009, Petitioner showed his wife the holes above his front door. Petitioner testified the three holes were each the size of a nickel. He called the police to report the incident and purchased material to fill in the holes, but never got around to doing it.

On September 29, 2009, Petitioner was asleep on the couch when he smelled smoke. He woke up and saw smoke from the ceiling by the front door. Petitioner screamed at everyone to get out and grabbed a quilt and another blanket to throw over the computers. He retrieved two fire extinguishers from outside, returned inside, and saw smoke. Petitioner opened the attic access and sprayed the extinguisher into that area. As he used the second extinguisher, the smoke became intense, and he had to get out of the house.

Petitioner's wife and mother-in-law, Fernando, dragged a large suitcase out of the house and Petitioner grabbed some laundry on the way out. When Petitioner got out of the house, he called 911 and grabbed the hose to spray water at the front door, near the area of the three holes.

When firefighters arrived, Petitioner showed them the three holes above his front door and told Reeder he believed he was the victim of vandalism and thought the it was an arson fire.

12

Petitioner acknowledged he was present when Whittington found the two plastic bottles. However, Petitioner stated he gave Whittington a stepladder to look into the attic space and Whittington removed the bottles from the area. After the fire, Petitioner stated he found a partially burned and melted videotape in the attic space, which he showed to Whittington.

Petitioner testified there was tension between himself and Whittington over Whittington's investigation of the fire. Petitioner told Whittington about the threatening phone calls, the suspicious incidents before the fire, and his conflicts with the homeowner's association. Petitioner believed the homeowner's association president, Ronald, started the fire to kill Petitioner and distract attention from the lien that the board filed against him. Petitioner was upset about Whittington's failure to follow any of these leads and sent two letters of complaint to the Fire Chief and district attorney's office about Whittington and his investigation.

Petitioner used the insurance money to pay for his family's living expenses after the fire; however, the proceeds did not cover the amount of the loss. The family initially lived in a hotel, before moving into the residence that Petitioner owned next to the damaged home. Petitioner bought the property in Palmdale California for $230,000. The deed of trust was dated October 23, 2009, but Petitioner testified that date was wrong because the sale closed on November 6, 2009. Petitioner testified that the Palmdale residence had not been listed for sale before the fire, which took place on September 29, 2009, and he had no knowledge of it until after the fire.

At trial, the prosecutor theorized Petitioner staged the fire for financial gain by reading about arson techniques on the internet, drilling the holes above the front door, then falsely reporting an act of vandalism, and placing the plastic bottles with an ignitable fluid in the attic space to act as an accelerant.

The defense theory was that Petitioner's friend left the two bottles of paint cleanup in the ceiling after Petitioner's renovation project, but without his knowledge, and an unknown arsonist

13

drilled the three holes and started the fire.

After both parties rested, the prosecution moved to amend the information to conform to the evidence adduced at trial, and add an enhancement to the arson count that Petitioner used a device designed to accelerate the fire—based on the presence of the two plastic bottles of ignitable fluid in the attic (Cal. Penal Code §451.1(a)(5)). The trial court granted the motion over defense counsel's objections. Defense counsel then moved to reopen his case to determine whether to call an expert to refute the enhancement, which the court denied.

Petitioner was convicted of arson of an inhabited structure or property, (Cal. Penal Code § 451(b)), with an enhancement for using a device designed to accelerate the fire (Cal. Penal Code § 451.1(a)(5)). Petitioner was sentenced to five years for arson and five years for the special allegation.

On December 10, 2015, the California Court of Appeal affirmed Petitioner's conviction. On March 16, 2016, the California Supreme Court denied review. Petitioner also filed several petitions for writ of habeas corpus with the Kern County Superior Court, California Court of Appeal, and California Supreme Court, which were all denied.

Petitioner filed his petition for writ of habeas corpus with this Court on October 30, 2017. (Doc. 14.) On February 27, 2018, Respondent filed an answer to the petition, and on March 19, 2018, Petitioner filed a traverse.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320,

322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state

court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

## III. <u>The State Court Did Not Err in Rejecting Petitioner's Prosecutorial Misconduct Claim</u>

At the second trial, the court admitted People's Exhibit No. 41, which was a certified copy of a grant deed for the house Petitioner purchased in Palmdale, California, after the fire. The recording date of November 10, 2009, is on page 2 of the grant deed. On the third page of the grant deed is the date October 23, 2009, which appears to be the date the grant deed was signed by the seller's agent. During trial, the prosecutor stated the grant deed had "a date of October 23, 2009." (*See* Reporter's Transcript 3 at 504; Reporter's Transcript 6 at 1006.) Defense counsel did not object to the prosecutor's comment.

Petitioner alleges prosecutorial misconduct based on the use of a "false closing date" of October 23, 2009 "on five occasions . . .[,] impeaching Petitioner's credibility through means which infected the trial and appellate process with such unfairness as to make the resulting conviction a violation of due process under the 5th, 6th, and 14th amendments." (Doc. 14 at 17.) Petitioner accuses the prosecutor of altering the date on the grant deed for the property in Palmdale, California "by removing two pages to give it the appearance of an earlier closing date." *Id*. Petitioner alleges

the actual closing date was November 10, 2009. *Id.* The grant deed admitted as exhibit No. 21 at the first trial was three-pages; whereas, the grant deed admitted as exhibit No. 41 at the second trial was five-pages in length.

Respondent counters the prosecutor's reference to the October 23, 2009, closing date was an "inadvertent mistake, not misconduct." (Doc. 34 at 26) (internal citations omitted.) Further, the prosecutor's remark was not prejudicial. *Id.*

**A.  Standard of Review**

A prosecutor's improper comments will be held to violate Constitutional rights only if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Prosecutorial misconduct violates the Due Process guarantee of a fair trial if it prejudicially affects the rights of the defendant. *United States v. Yarbrough*, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).

The Court must determine whether the alleged misconduct by the prosecutor rendered the trial fundamentally unfair. *Darden*, 477 U.S. at 183. In order to grant habeas relief, the Court must find that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. at 103).

**B.  State Court of Appeal Opinion**

In its order denying Petitioner's petition for writ of habeas corpus on May 16, 2014, the Kern County Superior Court rejected Petitioner's prosecutorial misconduct claim:

> Petitioner contends that [the prosecutor] engaged in a ruse on the court by not introducing the complete copy of the grant deed to 4817 Stargazer Blvd.[,] Palmdale[,] California.

17

He points to a letter . . . which states that [the prosecutor] stated . . . that he only received a copy of the deed that day. Nowhere in the letter does [the writer] state that there was any prosecution misconduct. The purpose of the deed was to show motivation to start the fire wherein [P]etitioner could use the insurance proceeds from the residence in Inyo-Kern to purchase the property in Palmdale.

The grantor was Jenny Cisneros from Texas. The issue before the court is who committed arson on the home in Inyo-Kern, not the legitimacy of the deed to the Palmdale residence, which is unquestioned. There is no evidence the prosecutor introduced fraudulent instruments before the court. Petitioner's allegation is not credible, and is conclusory. <u>People v. Duvall</u> (1995) 9 Cal.4th 464, 474.

The deed was only to show motive for the arson; there was more than adequate circumstantial evidence pointing toward [P]etitioner as the arsonist such as the bottles of accelerants, the computer searches, the odor of accelerants in the ceiling, and the denial of other persons whom [P]etitioner named as possible perpetrators.

Further there is ample motivation by [P]etitioner to commit arson: his unsuccessful litigation against the homeowners' association and Kern County regarding the lost election and the claim of nuisance; the collection of information from Foremost Insurance Co. on how to employ increased ventilation and accelerants to further spread a fire; and ultimately the collection of insurance proceeds to purchase the property in Palmdale. That matter was still under investigation by Foremost Insurance and the State Insurance Commissioner at the time of [P]etitioner's arrest.

(Doc. 34-2 at 5.) This claim was summarily denied by the California Court of Appeal on August 13, 2014. (Doc. 34-3.)

On September 28, 2015, the Kern County Superior Court denied a second petition for writ of habeas corpus filed by Petitioner. (Doc. 34-5.) Petitioner raised the prosecutorial misconduct claim, which the Court again denied:

Petitioner contends that the prosecutor committed misconduct by impeaching him about the date of the deed when it knew that escrow did not close on the property until November 10, 2009. . . . Petitioner asserts that the prosecution compounded the error by admitting a post-conviction letter . . . that the date of recordation was November 10, 2009.

Petitioner unduly concentrates on the date of the deed. The prosecution's theory is that purchasing the property in Palmdale provided the motive to start the fire. The insurance proceeds, if not used to make a down payment on the property could certainly be used to pay down the mortgage.

The signing of the grant deed even though escrow had not closed on October 23, 2009, less than a month after the fire, provides temporal proximity between the fire and the purchase of the property. Petitioner contends that prosecutors introduced a fraudulent deed or at least forged a deed to provide evidence for a conviction . . . . This court rejects that assertion. The genuineness of the deed of trust on the Palmdale property is not at issue.

(Doc. 34-5 at 3-4.) The claim was summarily denied by the California Court of Appeal on January 19, 2016, December 8, 2016, December 9, 2017, and April 13, 2017.

## C. **Denial of Petitioner's Prosecutorial Misconduct Claim Was Not Objectively Unreasonable**

On direct examination, Petitioner testified the Palmdale property was not listed for sale until after the fire and he was not aware of the property until approximately 10 days after the fire. (Reporter's Transcript 5 at 960.) On cross-examination, Petitioner was asked whether he bought the Palmdale property "on October 23, 2009, for $230,000?" *Id*. at 970. Petitioner replied, "I paid $230 for it, but I don't think it was in October. I think it closed in November. November 6, I believe." *Id*. The prosecutor showed Petitioner People's Exhibit No. 41, pointing out the October 23, 2009 date:

> [Prosecutor]: [Petitioner], I am showing you what's been marked People's Exhibit 41, certified LA Registrar docket.
>
> Do you see this grant deed dated October 23, 2009, with your name, Richard Peterson, and Deepika Peterson[, Petitioner's wife]?
>
> [Petitioner]: I see it, but I don't believe it. The date appears to have been from an autogenerated IndyMac.[6] I don't believe this is the correct date. And it's also not the date that's in the sworn affidavit of Chief Whittington.

*Id*. at 960-61.

During closing argument, the prosecutor argued that Petitioner started the fire for the

---

[6] IndyMac stands for Independent National Mortgage Corporation, which was an American bank based in California. (Doc. 34 at 24, n. 1.)

insurance proceeds: Petitioner's "motive in starting the fire was money – insurance money. [Petitioner] moved on September 29, 2009, from living . . . [in a] mobile home in Inyokern, to, on October 23, 2009, closing on a nice five-bedroom home in Palmdale." (Reporter's Transcript 6 at 1035.) Defense counsel did not object to this statement.

The grant deed shows that the seller relinquished its interest in the property on October 23, 2009, but escrow did not close until November 10, 2009. Therefore, the prosecutor incorrectly stated the date that escrow closed on Petitioner's house in Palmdale. However, "[a] prosecutor's inadvertent mistakes or misstatements are not misconduct." *United States v. Lloyd*, 807 F.3d 1128, 1168 (9th Cir. 2015).

In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. *Boyde v. California*, 494 U.S. 370, 385; *Darden*, 477 U.S. at 179-182. Factors for the Court to consider in determining the prejudicial effect of a prosecutor's misconduct include: (1) whether a curative instruction was issued, *see Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); (2) the weight of the evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming evidence" of guilt mitigated any prejudice); (3) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (5) whether the prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 181-82.

Here, the Kern County Superior Court considered the context of the prosecutor's misstatement of the date. The Superior Court found "Petitioner unduly concentrates on the date of the deed. The prosecution's theory is that purchasing the property in Palmdale provided the motive to start the fire." (Doc. 34-5 at 4.) The reason the prosecutor questioned Petitioner about the date was not to prove the specific date Petitioner purchased the new house, but to "provide[ ] temporal

20

proximity between the fire and the purchase of the property." *Id*.

A curative instruction was not made, as defense counsel did not object to the prosecutor's misstatement. However, as the Court of Appeal noted, there was overwhelming evidence of Petitioner's guilt:

> there is ample motivation by [P]etitioner to commit arson: his unsuccessful litigation against the homeowners' association and Kern County regarding the lost election and the claim of nuisance; the collection of information from Foremost Insurance Co. on how to employ increased ventilation and accelerants to further spread a fire; and ultimately the collection of insurance proceeds to purchase the property in Palmdale.

(Doc. 34-2 at 5.)

The prosecutor misstated the date on at least two occasions during the trial, during cross-examination and during closing argument, but the date was not a critical part of the prosecutor's case. The prosecutor pointed out the date Petitioner purchased the Palmdale property to show motive for the arson. However, the difference between October 23, 2009, and November 10, 2009, 18 days, does not change the prosecutor's argument that Petitioner was motivated to start a fire in his house to purchase a new house. The specific date was not important to the prosecutor's argument—the short time between the arson and the purchase of the new house was the critical evidence.

Even if the Court considered the prosecutor's statements about the purchase date of the Palmdale property to be improper, the statements were not prejudicial. Habeas relief is only appropriate where the prosecutorial misconduct has had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (internal citation and quotation marks omitted). As noted above, the evidence against Petitioner was substantial and the closing date on the Palmdale property was not critical to the prosecutor's case. In the context of the entire trial, the prosecutor's misstatement as to the closing date on the Palmdale property did not "so infect[ ] the trial with unfairness as to make the resulting conviction

21

a denial of due process." *Parker*, 567 U.S. at 45 (quoting *Darden*, 477 U.S. at 181).

For the foregoing reasons, the Court recommends denying Petitioner's claim of prosecutorial misconduct.

## IV.    The State Court Did Not Err in Denying Petitioner a Continuance at Trial

In his second ground for habeas relief, Petitioner claims the trial court violated his right to present a defense when it allowed the prosecution to amend the information after the parties rested to add an enhancement to the arson charge. (Doc. 14 at 23.) Petitioner further alleges the trial court erred in denying a defense request to reopen the case and call an expert witness regarding the enhancement. *Id*. at 24. Respondent counters that Petitioner has not presented clearly established Supreme Court precedent that grants him relief, nor could any fairminded jurist find the trial court's opinion to be unreasonable or arbitrary. (Doc. 34 at 36-37.)

### A.    Standard of Review

Trial courts are accorded broad discretion on matters regarding continuances. *See Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *Hernandez v. Holland*, 750 F.3d 843, 858 (9th Cir. 2014). "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589. The decision to grant a continuance is traditionally within the discretion of the trial judge, "and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Id*. "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar*, 376 U.S. at 589).

B. **State Court of Appeal Opinion**

The California Court of Appeal denied Petitioner's claim that the trial court erred in denying his request for a continuance or to reopen the case:

> [Petitioner] contends the court abused its discretion when it granted the prosecution's motion to add the enhancement, and denied his motion to reopen to call another expert to address the issues raised by that enhancement.

### A. Motions to Amend and Continue

> We begin with the well-settled law in this area. "The general framework within which criminal pleadings are amended is statutorily derived and has remained constant since 1911. [ ] [California Penal Code] Section 1009 authorizes amendment of an information *at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination.* If the substantial rights of the defendant would be prejudiced by the amendment, a reasonable postponement not longer than the ends of justice require may be granted. The questions of whether the prosecution should be permitted to amend the information and whether continuance in a given case should be granted are matters within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent a clear abuse of discretion. Moreover, a trial court correctly exercises its discretion by allowing an amendment of an information to properly state the offense at the conclusion of the trial. Similarly, where the amendment makes no substantial chance in the offense charged and requires no additional preparation or evidence to meet the change, the denial of a continuance is justified and proper. [ ]" (*People v. Winters* (1990) 221 Cal.App.3d 997, 1005 (*Winters*), italics added; *People v. Burnett* (1997) 71 Cal.App.4th 151, 165; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580-1581.)

> We now turn to the procedural history of this case, particularly about whether there was evidence at the preliminary hearing that plastic bottles contained ignitable fluids and were acceleration devices.

### B. Preliminary Hearing

> The fire occurred on September 29, 2009. On January 6, 2011, a felony complaint was filed charging [Petitioner] with arson and four counts of child endangerment for setting the fire while his minor children were in the mobile home.

> On May 26 and 27, 2011, the court conducted the preliminary hearing. Then-Captain Whittington was the only witness, and his testimony was very similar to what he later testified at trial.

At the preliminary hearing, Chief Whittington testified about the three holes drilled above the door and that he smelled mineral spirits by the door. He testified that Firefighter Dominguez used the chain saw on the ceiling, that two plastic bottles were discovered on the floor, that the bottom of the bottles had been cut open by the chain saw, that the bottles were empty, were burned and partially melted, which was consistent with liquid being inside. He further testified that he smelled mineral spirits from the bottles, and the bottles were about 25 feet away from the door where he smelled the same odor.

Chief Whittington testified the partially burned label on the bottles identified the contents as paint cleanup; and the laboratory tests on the bottles and the ceiling samples from the front door were positive for gasoline.

Chief Whittington testified that in his opinion, regardless of who was responsible for starting the fire, the fire's point of origin was the holes above the door. The plastic bottles were 25 feet away from the holes. The heat generated from the fire would have been enough to melt the two plastic bottles given the narrow depth of the attic space. Given the location of the fire, the bottles were moments away from being fully ignited when the firefighters extinguished the blaze. Whittington further testified to his opinion:

> "[T]he holes were intentionally drilled for the purpose of starting the fire, and that *the containers with the ignitable liquid in them were staged for the purpose of carrying the fire*." (Italics added.)

Chief Whittington testified that contents of the bottles were used as an accelerant.

> "Q. And absent this introduction of mineral spirits where you found them in the insulation area, *absent any introduction of that accelerant, would any attempt to light a fire at the holes find its way to the Paint Cleanup bottles*?
>
> "[A.] No.
>
> "Q. Was there any access that you could discern from inside the house that would otherwise permit somebody to place the mineral spirits in the area of the insulation that you found it?
>
> "A. No." (Italics added.)

Chief Whittington also testified about the forensic examination of [Petitioner]'s computer: A site about the arson school which Foremost Insurance conducts for its investigators had been visited, and the site discussed "the need for adequate ventilation with accelerants" to burn a recreational vehicle. Whittington testified recreational vehicles were constructed in the same manner as early-model mobile homes.

The court held [Petitioner] to answer on the arson count. The court dismissed the

child endangerment charges because the prosecution failed to present evidence on the children's precise ages.

On June 8, 2011, the information was filed which charged [Petitioner] with arson of an inhabited structure or property; it did not allege any enhancements.

### C. The First Trial

On November 2, 2012, [Petitioner]'s first trial began with motions in limine. On November 13, 2012, the presentation of evidence to the jury began. The instant record does not contain the reporter's transcript for the first trial. According to the minute orders, the testifying witnesses were Captains Reeder and Monterosso; Firefighters Dominguez and Jacobs; Deputy Sawaske; Chief Whittington; Dr. Spingarn and Connell.

As the trial progressed, [Petitioner]'s public defender became ill, and the trial was continued for several days. On November 26, 2012, the court declared a mistrial because of defense counsel's illness and unavailability, and the jury was excused.

### D. The Second Trial

On October 8, 2013, [Petitioner]'s second jury trial began with motions in limine. On October 11, 2013, the presentation of evidence to the jury began. As set forth in the factual statement above, Chief Whittington testified consistent with his preliminary hearing testimony, and in greater detail, about his opinion that the fire's point of origin was the three holes, the two plastic bottles contained ignitable liquids, and the fire was set to use the contents of the bottles as an accelerant for the fire.

### E. The Prosecution's Motion to Amend

[Petitioner]'s appellate contentions are based on the following sequence.

On October 22, 2013, after both parties rested, and before the jury was instructed, the court conducted the instructional conference in chambers. When the matter resumed on the record, the prosecutor moved to amend the information to conform to proof and add an enhancement to the arson charge, that [Petitioner] used a device designed to accelerate the fire ([Cal. Penal Code] § 451.1, subd. (a)(5)). The prosecutor argued:

> "The evidence in this case presented whoever lit the fire did use this accelerant device to fuel the fire. It is an enhancement. The evidence was presented, argued by both counsel, presented. And defense also presented defenses to dispute the evidence."

The court asked the prosecutor whether there were any discovery issues, and if one could argue "that discovery was never provided involving an accelerant in this case." The prosecutor replied that the investigative and laboratory reports were

provided to the defense "upon the initial filing years ago."

Defense counsel objected to the prosecution's motion to amend as "highly unusual."

> "In this particular case, the defense had spoken with an expert, a William Crisp out of LA, and had this enhancement . . . been added prior to trial or at least after the People's case-in-chief, we would have had an opportunity to call him in regards. He is an arson expert. I believe that allowing the prosecution to amend and add now would be highly prejudicial.

> "The People have had this case, this fire since 2009. As indicated by [the prosecutor], the testimony of Whittington regarding this device was presented at the preliminary hearing, was presented at the original trial, and at no time did they seek to amend and add.

> "If they had added this enhancement prior to the trial or at least during the trial, one it may have affected the negotiation on whether or not [Petitioner] wanted to offer a counteroffer; and, two, it may have affected how we presented our evidence.

> "To seek to amend and add after the close of evidence, I think, would be highly prejudicial to [Petitioner], and we are objecting."

The court asked defense counsel if she agreed with the prosecutor, "that the defense has been on notice involving the accelerant or the delaying device. . . . In other words, is there no discovery issue because the defense had this information certainly well before this trial began; and, therefore, it has not caught the defense off guard in that they had no idea this evidence existed?"

Defense counsel agreed "there's no discovery issue" but argued the defense was caught "off guard" by the proposed amendment.

> "[T]he People have had, since the filing of this, since the mistrial, more than enough time to amend and add this particular enhancement if they chose to. *It just would have shaped the evidence differently had we been given notice that they intended to amend*." (Italics added.)

The court asked the prosecutor whether the information about the accelerant was presented at the preliminary hearing. The prosecutor reviewed the preliminary hearing transcript and noted that Chief Whittington testified he smelled an ignitable liquid, the plastic bottles were melted, they smelled of mineral spirits, they were 25 feet away from the door, the test results from the bottles showed gasoline, and the same smell was at the door.

The court granted the prosecutor's motion to amend to add the enhancement pursuant to section 1009.

26

"To the extent that the defense may have been prejudiced by this enhancement simply because they were not aware the People would move to amend the Information to conform to proof that's been presented to this case, while that is a factor, it is not a significant factor in this court's opinion. What is significant is whether there's been prior notice of evidence existing either through typical discovery procedures or through a preliminary hearing. *And in this particular case, there is evidence both through discovery procedures involving the S&N Lab reports, in addition to the probable cause declaration that was utilized to question Chief Whittington, in addition to the testimony at the preliminary hearing.*

"For those reasons, it does not appear that this is an issue that would rise to the level of any discovery violations. It is the exact opposite in that the People have provided discovery of these – of this particular area to the extent that it would apply to an enhancement for the substantive charge." (Italics added.)

### F. [Petitioner]'s Motion to Continue and Reopen

Immediately after the court granted the motion to amend, defense counsel requested a "brief continuance" and leave to reopen. "I would like to speak with my expert Mr. Crisp and see what, if anything, he would say in relation to the time-delay technique. Without having given prior notice, as I indicated, I would have potentially called him had I known the People were going to amend and add this. I would ask for a continuance in order to do that, Your Honor."

The court denied [Petitioner]'s motion to continue and reopen without further comment.

### G. The Motion to Amend was Properly Granted

Based on this sequence, [Petitioner] argues the court abused its discretion when it granted the prosecutor's motion to amend the information to add the enhancement, and then denied his motion to continue and reopen to call another defense arson expert.

As explained above, the court may allow amendment of an accusatory pleading at any time up to and including and close of trial so long as there is no prejudice to the [Petitioner]. ([Cal. Penal Code] § 1009; *People v. Graff* (2009) 170 Cal.App.4th 345, 361.) An indictment or accusation, however, "cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) "'[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.' [ ]" (*People v. Jones* (1990) 51 Cal.3d 294, 317.)

We first note the proposed amendment was an enhancement pursuant to section

27

451.1, subdivision (a)(5), which provides that any person convicted of felony arson shall receive an additional term of three, four, or five years if "the arson was caused by use of a device designed to accelerate the fire or delay ignition." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 584, italics in original.) This statute was enacted in 1994 to increase penalties for ""the worst arsonist who exhibit a specific intent to inflict damage or who in fact inflict[ed] serious damage . . . ."" (*Id.* at p. 586.) A "'device designed to accelerate the fire' [ ] means a piece of equipment or a mechanism intended, or devised, to hasten or increase the progress of the fire." (*Id.* at p. 587.) The defendant's use of a "Molotov cocktail" or breaking a bottle of gasoline constitutes such a device. (*Ibid.*) In addition, the defendant's use of gasoline to fuel a fire, "no matter how it is contained or dispersed," also satisfies the enhancement. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1280.) "Because gasoline is used in connection with an arson to increase the strength and destructive power of the fire, it is consistent with the legislative intent to view the use of gasoline in connection with an arson as the use of a device designed to accelerate a fire within the meaning of the sentencing enhancement." (*Ibid.*) "As the use of gasoline in connection with an arson exhibits 'a specific intent to inflict damage' [ ] and is comparable to the use of lighter fluid to fuel a fire, we conclude based on the legislative history of section 451.1, subdivision (a)(5) that the act of pouring gasoline in a structure in connection with an arson is the 'use of a device designed to accelerate the fire' within the meaning of section 451.1, subdivision (a)(5)." (*Ibid.*)

As discussed above, [Petitioner] had a two-day preliminary hearing, which gave him notice of "the time, place, and circumstances" of factual and legal basis for the prosecution's theory that the plastic bottle and their contents were acceleration devices, as alleged in the subsequent amendment, which "is the touchstone of due process notice to a defendant. [ ]" (*People v. Jeff* (1988) 204 Cal.App.3d 309, 342.)(fn. 4) As required by section 1009, Chief Whittington's testimony at the preliminary hearing made [Petitioner] well aware that the prosecution's theory of guilt implicated his alleged use of an accelerant: the fire's point of origin was the three holes drilled into the cave above the north door, the plastic bottles were placed in the small attic void space, the laboratory reports stated they contained ignitable fluids, the plastic bottles were moments away from being fully ignited, the bottles were used as accelerants, they were "staged for the purpose of carrying the fire" through the attic space and the structure, and a fire ignited at the three holes would not have reached further into the structure without the use of the bottles as the accelerant.

fn. 4    [Petitioner]'s case is clearly inapposite to the circumstances in *Winters*, which held the trial court should not have granted the amendment because the [Petitioner] waived his right to a preliminary hearing, and section 1099 "specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing." (*Winters*, *supra*, 221 Cal.App.3d at p. 1007; *People v. Peyton* (2009) 176 Cal.App.4th 642, 654-659.)

The court did not abuse its discretion when it granted the amendment because the

prosecution's trial theory was virtually identical to the case presented at the preliminary hearing.  Indeed, [Petitioner]'s trial tactics reflected knowledge of the prosecution's theory and the evidence being presented.  The defense theory was that [Petitioner]'s handyman must have left the two bottles in the attic crawl space years earlier, and [Petitioner] did not know anything about it until the fire.  However, defense counsel also attacked the prosecution's evidence about the contents of the bottles, how they were discovered, the condition of the bottles, the contents, and whether they would have accelerated the fire.  Counsel extensively cross-examined the two experts from S&N Laboratories about the tests conducted on the bottles and the other evidence seized from the structure, and called a defense expert to challenge the accuracy of S&N's testing procedures.

### H.  The Court Properly Denied the Motion to Continue

We similarly conclude the court did not abuse its discretion when it denied [Petitioner]'s subsequent motions to conclude and reopen.  "A continuance will be granted for good cause [ ], and the trial court has broad discretion to grant or deny the request.  [ ]  In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request.  [ ]  One factor to consider is whether a continuance would be useful.  [ ]"  (*People v. Frye* (1998) 18 Cal.4th 894, 1012-1013, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Where the court properly grants an amendment to the information, and "the amendment makes no substantial change in the offense charged and requires no additional preparation or evidence to meet the change, the denial of a continuance is justified and proper.  [ ]"  (*Winters*, *supra*, 221 Cal.App.2d at p. 1005.)  Such is the case here.  As we have explained, the defense was well aware of the evidence in support of the prosecution's theory that the plastic bottles contained ignitable liquids, and the bottles were placed in the attic space, to fuel the fire started in the holes above the north door.  Defense counsel conceded there were no discovery issues.  Indeed, the prosecution's theory was set forth in the investigative reports, the laboratory reports, the preliminary hearing, and presumably through the testimony of Chief Whittington and the other firefighters at [Petitioner]'s first trial.

[Petitioner] relies on *People v. Murphy* (1963) 59 Cal.2d 818 (*Murphy*) and asserts an information may be amended at a late stage only to correct a clerical or typographical error, which "rarely if ever are a surprise to the defendant."  [Petitioner] argues the court must grant a continuance to allow the preparation of a defense when a late amendment is one of "substance" and involves a new allegation which must be proved beyond a reasonable doubt and carries an additional term of imprisonment.  [Petitioner] concludes the court abused its discretion under *Murphy* when it denied the continuance because the defense never had the opportunity to further investigate or present an affirmative defense to the accelerant enhancement, or cross-examine the prosecution witnesses on the new issue.

[Petitioner]'s reliance on *Murphy* is misplaced.  In that case, the trial court granted

the prosecution's motion to amend and add new charges, and denied the defendant's request for a continuance. (*Murphy*, *supra*, 59 Cal.2d 818.) *Murphy* held that while section 1009 vests the trial court with discretion whether to grant a continuance upon an amended pleading, "that discretion may not be exercised in such a manner as to deprive the defendant of a reasonable opportunity to prepare his defense." (*Murphy*, *supra*, at p. 825.) *Murphy* held the defendant's substantial rights were violated by both the amendment and the denial of the continuance, because the amendments were not supported by the preliminary hearing testimony and amounted to new charges. (*Id*. at pp. 826-827.) "The mere mention at the preliminary of some event not charged as an offense can scarcely be held to put a person on notice that he must be prepared to instantly go to trial on an information which substitutes the casually mentioned event for the offense which had been charged. [T]he transcript of the preliminary examination is devoid of evidence to support the charge . . . as thus amended . . . ." (*Id*. at p. 826.)

*Murphy's* holding is not applicable to this case, where there was a two-day preliminary hearing addressing the same issue implicated by the enhancement, and the defense to the enhancement would have been the same as the defense already raised at trial to the arson charge.

In addition, an amendment that exposes a defendant to increased criminal liability does not offend due process. Rather, the relevant inquiry is whether the amendment is supported by evidence at the preliminary hearing. (§ 1009; *People v. Arevalo-Iraheta*, *supra*, 193 Cal.App.4th at p. 1581.) We have already demonstrated that point. When defense counsel moved for the continuance, she said that she needed time to consult an arson expert in Los Angeles. Counsel stated she had previously consulted that expert, but never called him to testify even though the prosecution's theory was that [Petitioner] intentionally set up the acceleration device in the attic. The defense theory was that one of [Petitioner]'s neighbors started the fire because of his disputes with the homeowners' association, the culprit was responsible for the three holes mysteriously drilled above his door, and the plastic bottles just happened to have been stored in the small attic space for several years when the fire was started. Defense counsel ably cross-examined Chief Whittington about the nature and circumstances of his investigation, and his alleged failure to check the leads suggested by [Petitioner], primarily the animosity from his neighbors in the mobile home tract. Defense counsel also called defense experts to attack the reliability of the laboratory tests performed on the plastic bottles and ceiling samples, and the forensic search of [Petitioner]'s computer. Defense counsel relied on this evidence to assert that [Petitioner] was not responsible for the fire, someone else was the arsonist, and the bottles happened to have been stored in the attic space without his knowledge.

[Petitioner] failed to show how the defense case would have been different or needed additional witnesses in response to the well-known evidentiary support for the accelerant enhancement. We thus conclude the court did not abuse its discretion when it granted the prosecution's motion to amend and added the enhancement, and denied [Petitioner]'s motion to continue and reopen.

30

*People v. Peterson* (Cal. Ct. App. Dec. 14, 2015) (No. F068493), at 17-28.

**C. Denial of Petitioner's Request for a Continuance Was Not Objectively Unreasonable**

Here, the California Court of Appeal's decision was reasonable because it considered the information before the trial court at the time, and identified several reasons why the denial of a continuance was not an abuse of discretion. Specifically, the Court of Appeal noted the theory that Petitioner intentionally set the plastic bottles in the attic to accelerate the fire was known to the defense since the preliminary hearing, and "[Petitioner] failed to show how the defense case would have been different or needed additional witnesses in response to the well-known evidentiary support for the accelerant enhancement." *Id*. at 28. The Court reasonably found a continuance was not necessary since defense counsel had all the information regarding the plastic bottles and Whittington's testimony before the enhancement was added. *See Ibarra v. Ryan*, 312 Fed. Appx. 42, 43 (2009) ("Clearly established Federal law regarding the denial of continuances is set out at a high level of generality, requiring only that the state court consider the relevant circumstances – including more than time considerations – before denying a continuance. Because the trial court heard extensive argument on the issue and cited more than mere time concerns in its decision, [petitioner] is unable to show that it acted contrary to, or unreasonably applied, that clearly established federal law." (internal citations omitted)).

Even if the trial court erred in not granting Petitioner a continuance or his motion to reopen the case, Petitioner has not shown these decisions "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Petitioner does not establish how the trial court's denial of a continuance prejudiced the verdict. Rather, Petitioner simply contends it violated his "right to notice, right to compulsory process to call witnesses to rebut and the elements of the late amendment under the 6th amendment to the United States Constitution." (Doc. 14 at 24.) Because Petitioner cannot establish he suffered any prejudice from the trial court's

decision, the Court recommends denying his claim.

It appears Petitioner is actually contesting the trial court's decision to allow the prosecution to amend the information. Petitioner did not raise this issue on appeal, and instead raised the issue of whether the trial court erred in denying the continuance. Petitioner first raised the claim that the trial court erred in granting the amendment in a petition for writ of habeas corpus before the Kern County Superior Court. In its denial of the claim, the Court held:

> Petitioner filed a Writ of Mandate in the Fifth District Court of Appeals compelling reversal of this amendment. The court of appeals denied the writ on July 22, 2014 stating that whether the trial judge abused his discretion is a matter for appeal. Thus, habeas corpus is no substitute for appellate remedies. The appellate court is considering this issue. *In Re Dixon (1953) 41 Cal.2d[ ] 756, 759.*

(Doc. 34-5 at 7.)

The Court's citation to *Dixon* means that Petitioner's claim was denied on habeas review, because it could have been, but was not, raised on direct appeal. In California, courts may not consider claims on habeas review that should have first been raised on direct appeal. *Dixon*, 41 Cal. 2d at 760 ("It is, of course, an established rule that habeas corpus may not be used instead of an appeal to review determinations of fact made upon conflicting evidence after a fair trial."). Pursuant to California law, Petitioner procedurally defaulted on this claim.

A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements." *Park v. California*, 202 F.3d 1146, 1150 (2000).

A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th

Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)). The procedural default doctrine applies when a state court determination of default is based in state law that is both adequate to support he judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred, unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

California's procedural default rule is independent of federal law. *See Tran v. Sherman*, No. 1:15-cv-00716-LJO, 2015 WL 510879 at *1 (E.D. Cal. Aug. 31, 2015); *Sanchez v. Ryan*, 392 F. Supp. 2d 1136, 1138-39 (C.D. Cal. 2005); *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1007-08 (S.D. Ca. 2004). Consequently, because the Superior Court's denial was based on an independent state procedural rule, denial of the petition was on independent state law grounds.

A state law ground is "adequate" if it is "'firmly established and regularly followed' at the time it was applied by the state court." *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)). California's procedural default rule is established and followed in California state courts; therefore, the procedural ground was adequately applied and bars federal review by this Court. *See Sanchez*, 392 F. Supp. 2d at 1138-39; *Protsman*, 318 F. Supp. 2d at 1008. Based on the foregoing, California's procedural default rule is adequate and independent. Petitioner does not allege prejudice based on the California position that his claim

33

was procedurally defaulted; consequently, the Court recommends denying the claim.

## V. The State Court Did Not Err in Rejecting Petitioner's Ineffective Assistance of Counsel Claim

In his third ground for habeas review, Petitioner claims both trial and appellate counsel were ineffective when they "failed to investigate the misrepresentation and misstatement of facts by the prosecution regarding the 'certified' and 'self-authenticating' grant deed which the People claimed closed three weeks before the genuine closing date." (Doc. 14 at 29.) Further, Petitioner contends counsel was ineffective for failing to "investigate the genuine absen[c]e of ignitable liquids in the two plastic bottles which were subsequently claimed to be a device" and failing to refute Whittington's "opinion that 'the containers were halfway full.'" *Id* at 29-30. Finally, Petitioner contends appellate counsel was ineffective for "not citing the Alleyne v US decision."

### A. Standard of Review

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorneys' representation was deficient and (2) prejudice to Petitioner. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an

ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

### B. Denial of Petitioner's Ineffective Assistance of Counsel Claim Was Not Objectively Unreasonable

In a petition for writ of habeas corpus before the Kern County Superior Court, Petitioner alleged ineffective assistance of counsel. The Court stated it found "no ineffective assistance of counsel pertaining to the issues already discussed in this order. There is no need to repeat the analysis here." (Doc. 34-5 at 7.)

Petitioner first argues counsel was ineffective for not objecting to the prosecutor stating escrow closed on the Palmdale Property on October 23, 2009, rather than November 10, 2009. Petitioner also argues appellate counsel should have requested the transcript of his 2012 mistrial, "which would have established the fact the prosecutor altered and antedated" the grant deed exhibit. (Doc. 14 at 31.) Here, Petitioner repeats his prosecutorial misconduct claims as ineffective assistance of counsel claims. As the Court discussed in depth, *supra*, Petitioner did not suffer any prejudice from the prosecutor's misstatement. Therefore, Petitioner cannot show his counsel was ineffective because he did not suffer any prejudice from counsel's failure to object to the misstatement or order the transcript.

Petitioner also alleges his trial counsel "failed to investigate the genuine absen[c]e of ignitable liquids in the two plastic bottles which were subsequently claimed to be a device." *Id.* at 29. The Ninth Circuit has held that "a lawyer who fails adequately to investigate, and to introduce into evidence, evidence that demonstrates his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir. 2002) (quoting *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999) (holding that counsel's failure to review key documents corroborating defense

witness's testimony constituted deficient performance) (internal quotation marks omitted)).

Here, samples of the plastic bottles were tested by two laboratories, both of which found the presence of an ignitable liquid in some form. Petitioner's own expert conceded that either gasoline or mineral spirits were present on the samples. Further, the firefighters testified that they smelled a mineral spirit in the home and noticed fluid coming out of the ceiling. Based on this evidence, Petitioner has not demonstrated that his counsel failed to investigate the presence or absence of liquid in the plastic bottles.

Petitioner states his counsel was ineffective for "failing to refute Chief Whittington's opinion that 'the containers were halfway full.'" (Doc. 14 at 30.) Petitioner objects to Whittington's trial testimony, in which he opined the plastic bottles were at least half full of liquid when the fire began. Petitioner's counsel cross-examined Whittington during trial. Even if counsel failed to "refute" Whittington's opinion, Petitioner fails to demonstrate how he was prejudiced by this failure.

Finally, on appeal, Petitioner contends appellate counsel should have cited to *Alleyne v. United States*, 570 U.S. 99 (2013), "which makes enhancements (new facts) which increase the penalty and require proof of new specific elements which form a new aggravated crime that must be charged in the accusatory pleading." *Id*. at 31.

In *Alleyne*, the United States Supreme Court held that any fact that increases the mandatory minimum sentence for a crime is an "element" of the crime, not a "sentencing factor," and must be submitted to the jury. Petitioner does not state how the opinion in *Alleyne* applies to his case. A defendant's right to appellate representation does not include a right to present frivolous arguments to the court. *McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S. 429, 436 (1988). An attorney is "under an ethical obligation to refuse to prosecute a frivolous appeal." *Id.* Further, no United States Supreme Court decision holds a "defendant has a constitutional right to compel appointed counsel

to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Petitioner's appellate counsel made a professional judgment not to include these arguments in an appeal. Petitioner has not shown that "but for counsel's unprofessional errors, [Petitioner] would have prevailed on appeal."

For the foregoing reasons, the Court recommends denying Petitioner's ineffective assistance of counsel claims.

## VI.  Evidentiary Hearing

Petitioner requests the Court hold an evidentiary hearing. In habeas proceedings, "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). "It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise." *Id.* at 1176. Here, Petitioner's claim can be resolved by reference to the state court record. Accordingly, the Court recommends denying Petitioner's request for an evidentiary hearing.

## VII.  Motion for Summary Judgment

On September 24, 2018, Petitioner filed a "Motion for Summary Judgment #2, Failure to Provide Notice of New, Distinct Aggravated Crime, Denial of Fair Trial Rights." (Doc. 77.) In the motion for summary judgment, Petitioner realleges his second ground for writ of habeas corpus, that the trial court improperly allowed the prosecutor to amend the information. Because the Court recommends denying this ground for habeas relief, the Court recommends dismissing the motion for summary judgment as moot.

## VIII.  Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district

court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

>     (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
>     (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
>     (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>          (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
>          (B) the final order in a proceeding under section 2255.
>
>          (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
>          (3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the Court recommends declining to issue a certificate of appealability.

## IX.     Recommendations and Conclusion

Based on the foregoing, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability. Further, the undersigned recommends dismissing Petitioner's motion for summary judgment as moot.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C □ 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned □Objections to Magistrate Judge's Findings and Recommendations. Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated: __**November 20, 2018**__          _____/s/ *Sheila K. Oberto*_____

                                        UNITED STATES MAGISTRATE JUDGE